# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

MOSES CLARK,
CDCR #F-99760,

Plaintiff,

vs.

LARRY SMALL, Warden;
R. MADDEN, Correctional Captain,

Defendants.

Civil No. 09cv1484 L (JMA)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56(c)**
**[ECF No. 49]**

## I.
## PROCEDURAL BACKGROUND

Moses Clark ("Plaintiff"), a former state prisoner incarcerated at Calipatria State Prison ("CAL"), is proceeding pro se and *in forma pauperis* in this civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff, a Muslim, alleges the Warden of CAL, Larry Small, and a Correctional Captain R. Madden ("Defendants") violated his right to freely exercise his religion during Ramadan in 2008, while he was incarcerated at CAL. (Amend. Compl. at 6-7.)

On March 15, 2010, this Court dismissed Plaintiff's Fifth and Fourteenth Amendment claims, as well as Plaintiff's claims for damages against Defendants for acts alleged to have been taken in their official capacities; however, because Plaintiff's free exercise claims survived

/ / /

Defendants' Motion to Dismiss, they were ordered to Answer. *See* March 15, 2010 Order [Doc. No. 27] at 9.

Defendants have since filed a Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 [Doc. No. 49]. While Plaintiff was no longer incarcerated at the time, the Court nevertheless notified him of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) [Doc. No. 50].[1] On December 7, 2010, Plaintiff filed a Memorandum of Points and Authorities in Opposition [Doc. No. 57], as well as a separate Statement of Disputed Facts [Doc. No. 59]. On December 13, 2010, Defendants filed a Reply to both Plaintiff's Opposition, as well as his Statement of Disputed Facts [Doc. Nos. 60, 61].

While this case was randomly referred to the Honorable Jan M. Adler pursuant to 28 U.S.C. § 636(b)(1)(B) for disposition, the Court has determined that a Report and Recommendation regarding the disposition of the pending Motion is not necessary. *See* S.D. CAL. CIVLR 72.3(a). The Court has further found oral argument unnecessary pursuant to S.D. CAL. CIVLR 7.1.d., and for the reasons set forth below, GRANTS Defendants' Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(c).

## II.

## UNDISPUTED FACTS

From February 7, 2008, through October 16, 2008, Plaintiff was incarcerated at CAL. (Amend. Compl. at 4; Defs.' Appx. [ECF No. 49-3] Ex. J at 45.) Plaintiff is Muslim, whose "religious practice[] ... is deeply rooted in Islamic doctrine," and is a "product of sincere and personal religious belief." (Amend. Compl. at 8.) Sometime in August 2008, Plaintiff requested to be housed with a fellow Muslim inmate at CAL, and this request was granted. (Defs.' Appx. Ex. M (hereafter "Pl.'s Dep." ) at 74-75.)

/ / /

[1] *Klingele* and *Rand* require the district court to ensure that a pro se prisoner has been given "fair notice ... of the requirements and consequences of a summary judgment motion." *County of Los Angeles v. Beltran*, 514 F.3d 946, 952 (9th Cir. 2008) (citing *Rand*, 154 F.3d at 960-61).

In 2008, the Islamic holy month of Ramadan, which lasts for 30 days, began on September 2, 2008. (Amend. Compl. at 6; Pl.'s Dep. at 53.) During that time, Defendant Madden was the Captain of Facility A, where Plaintiff was housed. (Defs.' Appx. Ex. B ["Madden Decl."] ¶ 1; Pl.'s Amend. Compl. at 5.) Defendant Smalls was CAL's Acting Warden. (Defs.' Appx. Ex. A ["Smalls' Decl."] ¶ 1; Pl.'s Amend. Compl. at 5.)

From the beginning of Ramadan on September 2, 2008 through September 16, 2008, Plaintiff was able to assemble in the chapel with other Muslim inmates at about 3 p.m. until just after sunset, where they could pray at least 3 of 5 daily prayers, study the Koran, fast and then break the fast together by sharing a meal prepared by fellow Muslim inmates after sunset. (Pl.'s Dep. at 49-52, 56.)

On September 15, 2008, however, separate factions of a Hispanic inmate group in Facility A were involved in what both Defendants Small and Madden describe as a "large scale disturbance." (Small Decl. ¶ 6; Madden Decl. ¶ 5; Defs.' Appx. Ex. C "Program Status Report" [PSR].). On the following day, September 16, 2008, Facility C "experienced a large scale riot" between approximately 66 African-American and white inmates. (*Id.*)[2] According to both Defendants, several inmates suffered and were treated for contusions, laceration, punctures and abrasions as a result, including 6 who required medical treatment outside the prison. (*Id.*) Eight-three inmates were placed in Administrative Segregation, and Defendant Small "approved the decision," in conjunction with CAL's Chief Deputy Warden and Associate Wardens to institute a "lockdown and modified program" on CAL Facilities A, B and C "in order to

/ / /

/ / /

---

[2] In his Statement of Disputed Facts ("SDF") [ECF No. 59], Plaintiff objects to the term "riot" to describe the September 15, 2008 Facility A incident; however Defendants only describe the September 15th incident as a "large scale disturbance." *See* Pl.'s SDF at 4. Plaintiff further seems to dispute either that the September 16, 2008 "riot" on Facility C ever took place, or that it provided Defendants with justification to impose an institution-wide lockdown. *Id.* However, Plaintiff has pointed to no evidence in the record which contradicts Defendants' sworn statements as to events occurring in other parts of the prison, nor does he suggest that Defendants' Exhibits C-G, copies of the CDCR Form 3022 "Program Status Reports" [PSRs] initiated by Defendants in response to the September 15 and 16, 2008 incidents are not properly authenticated. *See* FED.R.EVID. 901(b)(7).

evaluate the circumstances surrounding these incidents." (Small Decl. ¶¶ 7, 9, 16; Defs.' Appx. Ex. C.)[3]

As the result of a Facilities search, physical evidence was gathered and weapons and minor contraband was found. Facility A staff also conducted 762 interviews with general population inmates, but by September 23, 2008, staff was still "uncertain if racial tension between Black and white inmates [would] continue." (Small Decl. ¶ 17; Defs.' Appx. Exs. C & E.) Therefore, Defendant Small "decided that the modified program had to continue." (Small Decl. ¶ 17.) On or about September 24, 2008, Defendant Small held a Program Status Meeting, to discuss any changes to the lockdown and modified program. (*Id.* ¶ 21.) As Captain of Facility A, Defendant Madden attended and presented recommended changes. (Madden Decl. ¶ 20.)

Following that meeting, on September 25, 2008, Defendant Madden submitted an updated modified program schedule (PSR) for Facility A, which was approved by Warden Small. (*Id.* ¶ 21; Small Decl. ¶ 22.) This PSR eased some, but not all, restrictions on Facility A inmates. (*Id.* ¶ 22; *see also* Defs.' Appx. Ex. F.) For example, Inmates on Facility A were allowed to leave their housing buildings and were permitted canteen and package pick-up, but only under escort and in groups of 10 or less. Facility A inmates were further granted access to the law library and weekend visitation which did not require escort or groups of ten or less. However, religious services "were to be conducted in-cell only." (*Id.*; see also Madden Decl. ¶ 21.) These modified program restrictions continued until October 2, 2008, when Defendant Madden reviewed "interviews conducted by prison staff at Facility A," and determined that they "revealed no identifiable threats to the security of Calipatria." (Madden Decl. ¶ 33.) As a result, Madden submitted a PSR "Part C" – Weekly Status / Closure report to Warden Small recommending a "return to normal program." (*Id.*; see also Defs.' Ex. G.) Both Warden Small

---

[3] A "lockdown means that a portion of the facility is affected by suspension of required programs and services, and inmates are not released except as determined by the facility administration on an individual[], case-by-case basis." CAL. CODE REGS., tit. 15 § 3000 (2009). "[U]nder such circumstances only critical inmates workers in the affected housing units/sub-facilities [are] permitted to attend work assignments under escort, and all but essential functions are suspended ... e.g., yard, canteen draws, *religious services*, and visiting." *Id.* (emphasis added).

and W.J. Sullivan, the Associate Director of the CDCR's General Population Levels III and IV, approved, modified program restrictions were discontinued, and Facility A returned to "normal program." (Madden Decl. ¶ 33; Small Decl. ¶ 34; Defs.' Ex. G.)

During the lockdown and modified restrictions which were imposed in the midst of Ramadan, from September 16, 2008 through October, 2, 2008, Plaintiff admits he was still able to offer his five daily prayers, (Pl.'s Dep. at 62), and during two or three of those prayers, able to pray along with his Muslim cellmate. (*Id.* at 74, 76, 82.) Plaintiff was also able to read the whole Koran throughout the course of Ramadan, (*id.* at 62, 76), continue his fast during the day, and break fast at sunset with his cellmate. (*Id.* at 74, 77-78, 81.) During the duration of the lockdown, Plaintiff and other practicing Muslims continued to be provided one hot meal and two sack lunches, which were prepared by fellow Muslim inmates and delivered to their cells. (*Id.* at 77-81.) An Imam or Muslim chaplain also "made the rounds" during the lockdown if an inmate requested "one-on-one in-house services." (*Id.*) Other religious leaders, including a Christian chaplain, offered the same in-cell consultation for Christian inmates. (*Id*. at 70-71.) Plaintiff "saw the chaplain in the housing unit," but he did not visit Plaintiff's cell. (*Id.* at 70.)

However, Plaintiff was no longer permitted to assemble in the chapel in the late afternoon until sunset, pray, study or break the day's fast with other Muslim inmates as a group, as he had during the first two weeks of Ramadan. (Pl.'s Dep. at 52-54, 91.) According to Plaintiff, the Koran "says ... it's for you to assemble at the mosque[,] ... make your prayers," and fast and during Ramadan. (*Id.* at 54-60.) Plaintiff claims Defendants' refusals to permit him to assemble with other Muslims during this time caused him "mental spiritual anguish, pain and suffering," (Amend Compl. at 9), "depressed" him, "messed [him] up spiritually," and "diminished the days of [his] spiritual experience." (Pl.'s Dep. at 91.)

Plaintiff seeks $1,500 in damages each against Warden Small and Captain Madden, for violating his right to free exercise of religion under the First Amendment and the Religious

/ / /

/ / /

/ / /

Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. (Amend. Compl. at 2, 9.)[4]

**III.**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A. FED.R.CIV.P. 56 Standard of Review**

Summary judgment is proper where there is no genuine issue of material fact in dispute and the moving party has shown it is entitled to judgment as a matter of law. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing FED.R.CIV.P. 56(c)).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED.R.CIV.P. 56(c)); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Bias*, 508 F.3d at 1218. To avoid summary judgment, the non-moving party is "required to present significant, probative evidence tending to support h[is] allegations," *Bias*, 508 F.3d at 1218 (citations omitted), and must point to some evidence in the record that demonstrates "a genuine issue of material fact [which], with all reasonable inferences made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing FED.R.CIV.P. 56;

---

[4] To the extent Plaintiff seeks damages against Defendants Small and Madden for acts taken in their official capacities, his claims are barred by the Eleventh Amendment. *See Sossamon v. Texas*, __ U.S. __, 131 S.Ct. 1651, 1633 (2011); *accord Holley v. California Dept. of Corrections*, 599 F.3d 1108, 1114 (9th Cir. 2010).

*Celotex*, 477 U.S. at 323); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "To defeat a summary judgment motion ..., the non-moving party 'may not rest upon the mere allegations or denials' in the pleadings. FED.R.CIV.P. 56(e). Instead, he "must establish the existence of a genuine factual dispute on the basis of admissible evidence; bare allegations without evidentiary support are insufficient to survive summary judgment." *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 n. 14 (9th Cir. 2008).

**B. Defendants' Arguments**

Defendants seek summary judgment on the following grounds: (1) no genuine issues of material fact exist to show they violated Plaintiff's First Amendment free exercise rights because the modified program restrictions imposed in CAL's Facility A from September 16, 2008 though October 2, 2008 were reasonably related to legitimate penological interests, (Defs.' Mem. of P&As in Supp. of Mot. for Summ. J. [ECF No. 49-1] at 14-16); (2) no genuine issues of material fact exist to show they violated Plaintiff's rights under RLUIPA, 42 U.S.C. § 2000cc-1 because: (a) Plaintiff's claims of "diminished spiritual fulfillment" are insufficient to show his religious exercise was "substantially burdened" pursuant to 42 U.S.C. § 2000cc-5(7)(A), (*id.* at 17); (b) the modified program restrictions in Facility A served a compelling government interest in establishing prison security, (*id.* at 17-18); and (c) the restrictions imposed upon Plaintiff's ability to participate in group worship during the lockdown and modified program schedule in Facility A from September 16, 2008 through October 2, 2008 constituted the least restrictive means to achieve prison security. (*Id.* at 18-20.) Finally, Defendants claim they are entitled to qualified immunity as to both Plaintiff's First Amendment and RLUIPA claims. (*Id.* at 20-22.)

Plaintiff opposes on all grounds, (Pl.'s Opp'n [ECF No. 57]), arguing that Defendants' refusal to permit him to congregate with other Muslims "substantially burdened" his "free exercise of religion" and was neither reasonably related to a legitimate penological interest under the First Amendment, nor the least restrictive means of achieving a compelling government interest under RLUIPA. (Pl.'s Opp'n at 7-11.) Plaintiff has also submitted a separate Statement of Disputed Facts, which mostly adopts Defendants' Statement of Disputed

Facts [ECF No. 49-2], with the few factual exceptions noted in Section II of this Order and discussed in the analysis below.

**C. Analysis**

**1. First Amendment Free Exercise Claim**

"The right to the free exercise of religion is a precious American invention, distinguishing our Constitution from all prior national constitutions." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). Inmates retain their First Amendment rights to free exercise of religion while incarcerated. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (Prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison."). To warrant protection under the First Amendment, religious belief must only be "sincerely held" and "rooted in religious belief," rather than in secular philosophical concerns. *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (quotations omitted); *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981).[5]

However, a prison regulation or official act may "impinge[ ] on inmates' constitutional rights ... if it is reasonably related to penological interests." *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008). It is "beyond question" that regulations "expressly aimed at protecting prison security" are legitimate, as this purpose is "'central to all other correctional goals.'" *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)).

Courts balance four factors to determine whether a prison regulation is reasonably related to legitimate penological interests: (1) whether there is a valid rational connection between the prison regulation and the legitimate government interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) whether accommodation of the asserted constitutional right will impact guards and other

---

[5] Defendants do not appear to challenge the validity or sincerity of Plaintiff's faith, but do claim that Plaintiff must show they burdened the practice of his religion by "preventing him from engaging in conduct mandated by his faith." *See* Defs.' P&A's in Supp. of Mot. for Summ. J. at 13-13 (citing *Freeman v. Arpaio*,125 F.3d 732, 736 (9th Cir. 1997). In *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008), however, the Ninth Circuit made clear "the sincerity test set forth in *Malik* and *Callahan* determines whether the Free Exercise Clause applies." *Id.* at 885.

inmates or prison resources generally; and (4) whether there is an absence of ready alternatives versus the existence of obvious, easy alternatives. *Shakur*, 514 F.3d at 884 (citing *Turner v. Safely,* 482 U.S. 78, 89–90 (1987)). In conducting this analysis, courts are to give significant deference to the views of prison officials in light of the "inordinately difficult" nature of prison operation. *Turner*, 482 U.S. at 84-85. Moreover, while "[t]he exercise of discretion ... may produce seeming 'inconsistencies,' ... inconsistent results are not necessarily signs of arbitrariness or irrationality." *Thornburgh*, 490 U.S. at 416 n.15.

The first *Turner* factor, which the Ninth Circuit has indicated is the most important, *see Morrison v. Hall*, 261 F.3d 896, 901 (9th Cir. 2001), inquires into whether there is a "rational connection" between the regulation and the proffered governmental interest used to justify the regulation. *Turner*, 482 U.S. at 89. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89-90.

Here, undisputed evidence in the record supports Defendants' contention that the lockdown and restrictions imposed on Plaintiff's ability to participate in group worship during the last two weeks of Ramadan were the result of the September 15th disturbance on A Facility, followed by a riot between white and African-American inmates the following day on Facility C. (Small Decl. ¶¶ 6-7; Madden Decl. ¶¶ 5-6.) While Plaintiff may not have been directly involved in either incident, many of his fellow inmates were injured, several seriously. (*Id.*) Undisputed evidence further shows Defendants imposed custody restrictions in order to stop further violence between inmates, secure the safety of all inmates and staff, facilitate an investigation into the cause of the riots and to discover and confiscate inmate-manufactured weapons. (*Id.*)

The Court finds this evidence sufficient to show a "valid, rational connection" between Defendants' decision to temporarily deny Muslim inmates the opportunity to congregate daily in Facility A for group prayer and their legitimate need to maintain order and security after two back-to-back race-based riots. *Turner*, 482 U.S. at 89; *Pell*, 417 U.S. at 832. The connection between Defendants' goal of maintaining order and preventing further racial violence and their

decision to temporarily suspend congregational opportunities for Muslim prisoners on Facility A, the majority of whom were African-American, while investigations and interviews into the cause of the September 15th and 16th race riots on Facilities A and C continued (Small Decl. ¶ 25), was "not so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90; *see also Friedman v. Arizona*, 912 F.2d 328, 332-33 (9th Cir. 1990) (finding evidence concerning anticipated problems, even though no actual problems arose from the prisoner's conduct, sufficient to satisfy *Turner's* first factor).

The second *Turner* factor looks to whether there are "alternative means of exercising the right" by the inmate. *Turner*, 482 U.S. at 90; *O'Lone*, 482 U.S. at 351-52. "The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [the Court must] determine whether the inmates have been denied all means of religious expression." *Ward*, 1 F.3d at 877. In *O'Lone*, which is similar to Plaintiff's case insofar as the plaintiff there challenged prison regulations preventing Muslim prisoners assigned to outside work details from attending Jumu'ah, or Friday congregational prayer services, the Supreme Court found that the First Amendment did not require prison officials to offer inmates alternative means of attending Jumu'ah, because other means of religious expression remained available. 482 U.S. at 351-52.

Here, Plaintiff's own deposition testimony provides sufficient evidence to show that while he was not able to congregate daily with other Muslim inmates and offer group prayers during the last days of Ramadan, he was able to read the entire Koran, pray alone and with his cellmate, and was provided with special meals facilitating his fast, as well as the opportunity for in-cell consultations with an Imam or Muslim chaplain. *See* Pl.'s Dep. at 62, 74, 76, 78, 81. Thus, Plaintiff admits he was not denied "all means of religious expression," but only the opportunity to pray together with Muslims other than his cellmate. *See Shakur*, 514 F.3d at 886. Thus, there are no genuine issues in dispute regarding whether Plaintiff had some alternative means of practicing his faith during Ramadan, nor is there any evidence which shows Plaintiff was "denied all means of religious expression." *Ward*, 1 F.3d at 877. While Plaintiff may

believe that offering in-cell prayers with his Muslim cellmate was not as spiritually meaningful as group prayer in the chapel, especially during Ramadan, given the other accommodations made available to him under security-threatening circumstances, the Court finds the record sufficient to show Plaintiff nevertheless "retained the ability to participate in other significant rituals and ceremonies of [his] faith." *Id.* Accordingly, the Court finds no triable issue of fact exists to show Plaintiff was deprived of "all forms of religious exercise," during the lockdown. *O'Lone*, 482 U.S. at 352-53; *see also Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir. 2001) (noting that "although there is no substitute for attending Jumu'ah services, the absence of alternatives does not require a holding in favor of the inmates [if] they 'retain the ability to participate in other Muslim religious ceremonies.'). Thus, the second *Turner* factor also weighs in favor of Defendants.

The third *Turner* factor requires examination of the impact the accommodation of Plaintiff's request "will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90; *Shakur*,514 F.3d at 886. In evaluating this factor, the Court may consider security concerns, as well as whether the "appearance of favoritism ... could generate resentment and unrest." *Standing Deer v. Carlson*, 831 F.2d 1525, 1529 (9th Cir. 1987); *McCabe v. Arave*, 827 F.2d 634, 637 (9th Cir. 1987). The perception of favoritism "is not in itself dispositive," however, because it "is present in every case that requires special accommodations for adherents to particular religious practices." *Ward*, 1 F.3d at 878. Moreover, security concerns, such as the prisoner's need for segregation for his own protection or disciplinary reasons, standing alone, will not automatically justify the denial of his opportunity to practice religion. *Pierce v. County of Orange*, 526 F.3d 1190, 1209-11 (9th Cir. 2008) (finding denial of group worship for administratively segregated detainees required individualized assessment of circumstances, and not "blind[] defer[ence] to the [Defendants'] bare invocation of security concerns.").

Defendants Small and Madden claim they considered permitting religious groups, including Muslims, to assemble in the chapel during the lockdown in smaller groups, but rejected the idea because "evaluation of the incidents was still ongoing," and the "chapel is a

small room with one door and window and [did] nor provide any gun coverage capability or tactical advantage should violence erupt." (Small Decl. ¶ 25; Madden Decl. ¶ 24.) Defendants also claim that because "there was still a threat of violence," accommodating even smaller groups of 10 or 30-40 to worship together would have required the presence of additional correctional officers to escort them, especially during the third shift (2:00 p.m. to 10:00 p.m.) when there were "only 13-15 correctional staff working at A Facility, which housed 800 general population inmates," and during which time they needed to distribute food to the remaining prisoners who were still restricted to their cells and required shower escorts. (Small Decl. ¶ 26-27; Madden Decl. ¶ 25-26.) Small-group chapel worship "would have necessitated an Imam ... to be available ... on three or four separate occasions each day," and other Catholic and Jewish programs used the same chapel and would also require escorts on multiple occasions during the same time. (Small Decl. ¶ 29; Madden Decl. ¶ 28.) Finally, Defendants contend they could not choose which inmates would comprise the small groups or decide in which order they could attend "without being arbitrary." (Small Decl. ¶ 28; Madden Decl. ¶ 27.)

Plaintiff, for his part, asserts "the Muslim prisoners ... [weren't] involved in the race riot" (Amend. Compl. at 8), and "there was no threat on A Facility when Defendants approved the modified program" on September 25, 2008." (Pl.'s SDF at 5 ¶ 37.) Plaintiff further claims staff was available to escort inmates to chapel, and claims "the Ramadan religious program was set up to use only one officer from 3:00 p.m. to 8 p.m." (*Id.* ¶¶ 39, 40.)

The fact that Plaintiff was able to congregate for group prayer during the first part of Ramadan with fellow Muslims in the chapel under the supervision of only one officer, however, does not account for the heightened security required during the lockdown on Facility A *after* September 16, 2008. *See Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977) (in First Amendment context, deference must be paid to "prison administrators ... to make the difficult judgments concerning institutional operations."); *see also O'Lone,* 482 U.S. at 353. Moreover, while Plaintiff contends no Muslims were involved in the riot which engendered the lockdown, he proffers to no evidence in support, nor has he pointed to any other evidence in the record which contradicts Defendants' claims that as of September 25, 2008, when they modified

the lockdown, but continued to restrict religious service to "in-cell only," that the investigation into the "cause of the disturbance" was still "inconclusive," or that "staff [was] uncertain if racial tension between Black and White inmates w[ould] continue." (Small Decl. ¶ 22; Madden Decl. ¶ 21; Defs.' Exs. D & E.) Finally, Plaintiff does not dispute Defendants' fear of potential perceived favoritism which might result when selected inmates already on lockdown were granted congregational permission and others were not. *See Ward*, 1 F.3d at 878 (considering under *Turner's* third factor, Warden's contention that favoritism could "have an adverse impact on prison morale," and cause "disruption throughout the prison."); *O'Lone*, 482 U.S. at 353 (concluding that "accommodations of [prisoners'] request to attend Jumu'ah would have undesirable results in the institution."). Based on this record, the Court finds consideration of *Turner*'s third factor also weighs in Defendants' favor.

Under the final *Turner* factor, the Court must consider whether genuine issues of material fact exist to show there were ready alternatives which would have accommodated Plaintiff during the lockdown at a de minimis cost. *Ward*, 1 F.3d at 879; *Turner*, 482 U.S. at 90-91 (the existence of alternatives may be "evidence that the [policy] is not reasonable but is an 'exaggerated response' to prison concerns."). As discussed above, Defendants Small and Madden claim escorting small groups of 10 to the chapel during lockdown would have required additional correctional staff on Facility A during the third shift. (Small Decl. ¶ 26-27; Madden Decl. ¶ 25-26.) While common sense suggests additional staffing would cost the prison money, there is no evidence in the record to suggest what that cost might be. However, Defendants do not bear the burden of disproving the availability of alternative accommodations in order to defend a First Amendment free exercise claim. *O'Lone*, 482 U.S. at 350. Instead, the burden is on Plaintiff to disprove their asserted rationale, *i.e.*, Plaintiff must point to evidence in the record which shows either that additional correctional staff was not required, or that the cost of providing that staff would be "de minimus." *See Ward*, 1 F.3d at 879. Without more, then, the Court cannot conclude that Defendants' decision to restrict congregational worship in Facility A from September 16, 2008 through October 2, 2008 was an "exaggerated response" to their legitimate security concerns. *Turner*, 482 U.S. at 90-91; *O'Lone*, 482 U.S. at 353.

In sum, having thoroughly reviewed the record and evaluated the evidence in light of the *Turner* factors, the Court finds that the Defendants have come forward with evidence establishing the existence of a legitimate penological justifications which are rationally related their decision to restrict Plaintiff's ability to participate in congregational prayer from September 16, 2008 through October 2, 2008. *See Beard v. Banks*, 548 U.S. 521, 525 (2006). Plaintiff, however, has failed to carry his burden of pointing to evidence in the record sufficient to create a genuine issue for trial with regard to his First Amendment claim. *Id.* (affirming summary judgment on prisoner's First Amendment claim where he failed to set forth "specific facts" that, in light of the deference that courts must show to the prison officials, [to] warrant a determination in his favor."); FED.R.CIV.P. 56(e); *Bias*, 508 F.3d at 1218.

Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment on First Amendment grounds.

**2. RLUIPA**

"The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., requires the government to meet a higher burden of proof than the rational basis standard of *Turner*." *Pierce v. County of Orange*, 526 F.3d 1190, 1209 n.19 (9th Cir. 2008) (citing *Greene v. Solano County Jail*, 513 F.3d 982 (9th Cir. 2008)). "Recognizing the significance of religious freedom in all aspects of life, Congress passed ... RLUIPA to 'protect[ ] institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion.'" *Khatib v. County of Orange*, __ F.3d __, 2011 WL 873301 at *1 (9th Cir. 2011) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005)).

RLUIPA prevents states from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the state can establish that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* (citing 42 U.S.C. § 2000cc-1(a)). In analyzing a RLUIPA claim, the court "must begin by identifying the 'religious exercise' allegedly impinged upon." *Greene*, 513 F.3d at 987. Next, the court "ask[]s

whether the prison regulation at issue 'substantially burdens' that religious exercise." *Id.* In order to establish a "substantial burden," the relevant restriction must have "denie[d] an important benefit [derived from] conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur*, 514 F.3d at 888 (internal quotations omitted).[6] Under RLUIPA, Plaintiff "bears the initial burden of going forward with evidence to demonstrate a prima facie claim that the challenged state action constitutes a substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).

If Plaintiff establishes a "substantial burden," Defendants must then establish that the act or decisions which substantially burdened his religious exercise "further[ed] a compelling governmental interest, and d[id] so by the least restrictive means." *Greene*, 513 F.3d at 988 (internal quotes and citations omitted); *Shakur*, 514 F.3d at 889. "[P]rison security is a compelling state interest, and ... deference is due to institutional officials' expertise in this area." *Cutter*, 544 U.S. at 725 n.13. However, in order to carry their burden, prison officials cannot "justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison." *Greene*, 513 F.3d at 889-90. Instead, they must show that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999. "If prison officials meet th[is] standard, the prison regulation passes muster under RLUIPA, regardless of the burden it imposes on religious exercise." *Greene*, 513 F.3d at 990.

Here, Defendants first claim their conduct "did not burden the practice of Plaintiff's religion, but only diminished his spiritual fulfillment." *See* Defs.' P&As in Supp. of Mot. for Summ. J. at 17 (citing Pl.'s Dep. at 91.) However, in *Greene*, the Ninth Circuit explicitly held that an "outright ban on a particular religious exercise," specifically, a jail's policy prohibiting

---

[6] "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, see 42 U.S.C. § 2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity. *Cf. Gillette v. United States*, 401 U.S. 437, 457 (1971) ("'[T]he "truth" of a belief is not open to question'; rather, the question is whether the objector's beliefs are 'truly held.'"(quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)))." *Cutter*, 544 U.S. at 725 n.13.

a maximum security prisoner from attending group worship services "substantially burdened his ability to exercise his religion" under RLUIPA. *Greene*, 513 F.3d at 988; *see also Murphy v. Mo. Dept. of Corrections*, 37 F.3d 979, 988 (8th Cir. 2004) (ban on "communal worship" constituted a "substantial burden"); *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (wholesale prison policy prohibiting group worship for Nation of Islam prisoner who refused to fast during Ramadan imposed "substantial burden" on his religious practice). Thus, the Court finds Plaintiff has satisfied his burden to show that Defendants' refusal to permit congregational prayer in Facility A from September 16 through October 2, 2008 substantially burdened his exercise of religion. *See Warsoldier*, 418 F.3d at 994; 42 U.S.C. § 2000cc-2(b).

Accordingly, the burden then shifts to Defendants Small and Madden to show that their decision to restrict Plaintiff's religious practice to "in-cell only" during the lockdown was taken in furtherance of a compelling governmental interest and was the least restrictive means of furthering that interest. *Greene*, 513 F.3d at 988; *Shakur*, 514 F.3d at 889; 42 U.S.C. § 2000cc-1(a). Defendants claim, and undisputed evidence in the record is sufficient to show, that their lockdown was imposed to prevent further violence between inmates, secure the safety of all inmates and prison staff, protect institutional property, facilitate an investigation into the cause of the September 15, 2008 "large-scale disturbance" on Facility A and September 16, 2008 race riot on Facility C, and to discover and confiscate any inmate-manufactured weapons and contraband. (Small Decl.¶ 18, 35-36; Madden Decl. ¶¶ 17, 34-35.) There is no question that "maintain[ing] good order, security and discipline, consistent with consideration of costs and limited resources" is a compelling government interest. *Cutter*, 544 U.S. at 722, 725 n.13; *Greene*, 513 F.3d at 988-89; *Warsoldier*, 418 F.3d at 998.

Thus, the Court must next consider whether Defendants' decision to restrict Plaintiff's ability to attend congregational prayer was the "least restrictive means" by which they could achieve prison security under the circumstances. *Greene*, 513 F.3d at 989. In this regard, Defendants Small and Madden argue they decided to impose in-cell only religious program restrictions from September 16, 2008 through October 2, 2008, the last day of Ramadan, because the majority of the inmates who practice Islam are African-American, and despite

ongoing investigations and interviews, staff remained uncertain as to whether the racial tension between whites and African-Americans which culminated into a riot on September 16, 2008 had yet dissipated, whether there remained a risk that tension would continue among the general population, or whether a potential race riot could be planned and executed in Facility A if African-American were permitted to congregate. (Small Decl. ¶ 25; Madden Decl. ¶ 24.) Plaintiff acknowledges that a "race riot occurred with Black and White prisoners" on September 16, 2008 on Facility C, but contends "the Muslim prisoners on either facility [weren't] involved." (Amend. Compl. at 8.) Plaintiff further argues that because Defendants did, on September 25, 2008 modify the lockdown to resume other "normal" program privileges, like medical, mail, telephone, law library and canteen visitation, their decision to continue an "in cell only" religious program "was not the least restrictive means of keeping inmates and guards safe after the riot." *See* Pl.'s Opp'n at 10; Amend. Compl. at 8.

Defendants contend, however, that they did consider various alternative to restricting religious services during the lockdown and subsequent modified program period beginning on September 25, 2008. Specifically, Defendants "considered allowing religious groups, including Muslims, to assemble in the chapel." (Small Decl. ¶ 25; Madden Decl. ¶ 24.) However, the chapel is "a small room with only one door and window," which "[did] not provide and gun coverage capability []or tactical advantage should violence erupt." (*Id.*) Because an "evaluation of the circumstances surrounding the incidents [prompting the lockdown] was still ongoing, and the difficulty prison officials would have "observing the inmates and their activities through one window," Defendants determined a congregation of 30-40 would have also "necessitated the presence of additional correctional officers" during the third shift, when only 13-15 staff were assigned to Facility A, which housed a total of 800 general population inmates at the time. (*Id.*) For these reasons, Defendants rejected the 30-40 member congregation option. (*Id.*)

Defendants next considered whether smaller groups of 10 were feasible. (Small Decl. ¶ 27; Madden Decl. ¶ 26.) However, this option would have required even more correctional officers to escort the groups to chapel while the rest of the facility was still restricted to cells,

required food distribution and shower escorts. (*Id.*) The small groups would also require an Imam or Muslim chaplain's presence "on three or four separate occasions each day," and would make the chapel less available for other religious programs and inmates who would also require escorts. (Small Decl. ¶¶ 27-29; Madden Decl. 26-28.)

Unlike the prison officials in *Greene*, who justified their restrictions on congregational worship based only on the inmates' classification status, and who were not operating under lockdown conditions in the aftermath of a race riot, 513 F.3d at 889, and *Shakur*, who premised their denial of a Kosher diet to a Muslim inmate based only "conclusory assertions" that denying his request for a dietary accommodation already offered to Jewish inmates was "the least restrictive means of furthering its interest in cost containment," 514 F.3d at 890-91, the record before this Court reveals no triable fact as to whether Defendants "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Greene*, 513 F.3d at 889 (citing *Warsoldier*, 418 F.3d at 999). Undisputed evidence in the record before this Court shows they did; thus, Defendant Small's and Madden's actions "pass[] muster under RLUIPA, regardless of the burden ... impose[d] on [Plaintiff's] religious exercise." *Id.* at 990. For these reasons, this Court finds Defendants are entitled to summary judgment even under RLUIPA's least-restrictive means test. *See* 42 U.S.C. § 2000cc-1(a).

In reaching this conclusion, the Court is careful to distinguish the record in this case from those before the courts in *Greene* and *Warsoldier* because reasonable jurists could not conclude that it involves prison officials who "simply cit[e] the need to maintain order and security in a prison" in order to blankly justify a restriction on an inmate's religious exercise. *Cf.*, *Greene*, 513 F.3d at 889-90; *Warsoldier*, 418 F.3d at 998. Instead, the Court finds the evidence here, involving a relatively short-lived prison lockdown imposed only after two back-to-back racial altercations in two separate prison yards, is precisely the type of circumstance the Supreme Court contemplated in *Cutter*, when it cautioned that RLUIPA does not require a prison's "accommodation of religious observances" "over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722. To the contrary, "an accommodation must be measured so that it does not override other significant interests." *Id.*

The Ninth Circuit too has recently noted, albeit in an Eighth Amendment context, that when a prison lockdown is imposed "in response to a genuine emergency," and where "restrictions were eased as the prison administration determined that the emergency permitted," as was the case at CAL from September 16, 2008 through October 2, 2008, the Court "may not lightly second-guess officials' expert judgments about when exercise and other programs could safely be restored." *Norwood v. Vance*, 591 F.3d 1062, 1070 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 1465 (U.S. Feb 22, 2011) (No. 09-1215). "These decisions are 'delicate ones, and those charged with them must be given reasonable leeway.'" *Id.* (quoting *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980). For all these reasons, the Court also GRANTS Defendants' Motion for Summary Judgment on RLUIPA grounds.

**3. Qualified Immunity**

Finally, Defendants argue they are entitled to qualified immunity. (Defs.' P&A's at 20-23.) Because the Court has found no triable issue of fact exists to show Plaintiff's free exercise rights were violated under either the First Amendment or RLUIPA, however, it need not reach any issues regarding qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## IV.

## CONCLUSION AND ORDER

Accordingly, Defendants' Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(c) [ECF No. 49] is **GRANTED**. The Clerk shall enter judgment for Defendants Small and Madden and shall close the file.

**IT IS SO ORDERED**.

DATED: May 23, 2011

M. James Lorenz
United States District Court Judge

COPY TO:

HON. JAN M. ADLER
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL